J-S09001-21

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| S.P. | : | IN THE SUPERIOR COURT OF |
| | : | PENNSYLVANIA |
| Appellant | : | |
| | : | |
| | : | |
| | : | |
| v. | : | |
| | : | |
| | : | |
| B.S. | : | No. 1858 EDA 2020 |

Appeal from the Order Entered September 24, 2020
In the Court of Common Pleas of Lehigh County Civil Division at No(s):
No. 2015-FC-1443

| S.P. | : | IN THE SUPERIOR COURT OF |
| | : | PENNSYLVANIA |
| Appellant | : | |
| | : | |
| | : | |
| | : | |
| v. | : | |
| | : | |
| | : | |
| | : | |
| B.S. | : | No. 1859 EDA 2020 |

Appeal from the Order Entered September 16, 2020
In the Court of Common Pleas of Lehigh County Civil Division at No(s):
No. 2015-FC-1443

| S.P. | : | IN THE SUPERIOR COURT OF |
| | : | PENNSYLVANIA |
| Appellant | : | |
| | : | |
| | : | |
| | : | |
| v. | : | |
| | : | |
| | : | |
| B.S. | : | No. 1886 EDA 2020 |

Appeal from the Order Entered September 16, 2020
In the Court of Common Pleas of Lehigh County Civil Division at No(s):
No. 2015-FC-1443

BEFORE:  OLSON, J., McCAFFERY, J., and MUSMANNO, J.

MEMORANDUM BY OLSON, J.:                    **FILED: APRIL 19, 2021**

In this consolidated appeal,[1] Appellant, S.P., the biological father, ("Father") appeals from the September 16, 2020 Order ("the First Passport Order") releasing certain passports of S.H.S., a child, born December 2005, to B.S., the biological mother, ("Mother");[2] the September 24, 2020 Order ("the Second Passport Order") releasing certain passports of S.H.S. and certain passports of S.S., a child, born October 2007, to Mother;[3] and the September 16, 2020 Final Custody Order ("the Final Custody Order") denying Father's petition requesting that Mother be held in contempt of a March 15, 2018 custody order. We affirm.

The trial court summarized the pertinent factual history as follows:

The parties were married on March 20, 2005[, in the Republic of] India, their native country. Father is [currently] unemployed. Mother is [currently] engaged in [software testing] since October 2019. Father left the marital residence in the summer of 2014. On October 26, 2015, Father filed a complaint in divorce with a count for equitable distribution, alimony, [] alimony p*endente lite*, counsel fees[,] and costs. At that time, Father averred that he

---

[1] In a November 17, 2020 *per curiam* order, this Court consolidated Father's three appeals *sua sponte*.

[2] The First Passport Order directed the Family Court Office for Lehigh County, Pennsylvania to release "the expired Republic of India [p]assport and the [r]enewed Republic of India [p]assport for [S.H.S.] to [Mother]" Trial Court Order, 9/16/20.

[3] The Second Passport Order directed the Lehigh County Clerk of Judicial Records to release "the expired Republic of India [p]assport of [S.H.S.] [(passport expired in 2011)] and the two expired United States of America [p]assports of [S.S.] to [Mother]" Trial Court Order, 9/24/20.

- 2 -

was residing at the United States Post Office [in] Allentown, [Pennsylvania]. To date, Mother has remained in the marital residence [in Lehigh County, Pennsylvania]. The [trial court] docket reflects that Father's mail has repeatedly been returned to the [trial] court as "undeliverable." []Father [subsequently changed his address with the trial court] from [the physical street address of the United States Post Office in Allentown, Pennsylvania] to [a post office box located within the United States Post Office in Allentown, Pennsylvania].

[On] January 29, 2016, Mother filed a related claim for custody, seeking sole legal and physical custody of the two [children]. On April 15, 2016, at a custody conference, the parties agreed to share legal custody of the children, with Mother having primary physical custody and Father having partial physical custody. Footnote 3 of that agreed-to [custody] order provided that[,] "Father is currently living and working in Virginia. Father is traveling from Virginia to Pennsylvania to pick the children up on alternating weekends." Father's custody [of the children] was to occur on alternating weekends, Friday evening until Sunday evening[,] provided that he had given Mother advance notice of his itinerary including an address and telephone number where he [would] exercise his custodial weekend. Additionally, Father was to provide Mother with advance notice if he did not intend to exercise his [custodial] weekend[.] The parties agreed to meet at [a restaurant establishment] in Allentown for the custody exchange.

The parties continued to litigate divorce[-]related issues[,] as well as [the terms of] custody. A custody trial was held March 8, 2018[,] and a [then] final custody order was entered on March 15, 2018[,] by agreement. [The custody order] provided for shared legal custody, with Mother having primary physical custody and Father having partial physical custody.

. . .

On July 10, 2018, Mother filed a petition for modification of [the March 15, 2018] custody order[.] Mother established that due to Father's inconsistent pattern of custody and given the extracurricular activities of the children, modification of the alternating weekend schedule[,] as well as the four weeks of vacation allotted to each parent, [was] in the children's best interests.

- 3 -

[]Mother [had] legitimate concerns regarding Father's transiency, lack of a steady residence, and inconsistent exercise of [custodial] time.  []Father has not had a significant role as a parent.  The [trial court] record from April 20, 2018[,] through early September[] 2018[,] demonstrate[d] that Father exercised approximately 40% of his custodial time.  The five months are filled with repeated instances of Father[] cancelling his full custodial time and[,] instead, exercising [] one full weekend [of custodial time] monthly, [] one overnight [stay], or a day visit.  The TalkingParents [service[4]] records evidence[d] the difficulty associated with bi-weekly exchanges between Mother and Father.  A few examples [were] demonstrative.  The May 25, 2018 weekend concluded with Father calling the police on Mother and the children.  Unbeknownst to the children, they left his custody with Father's keys.  Instead of a simple call to Mother, Father summoned the police and created more drama for the family.  In June 2018, Mother lost patience with Father's inconsistency and because he cancelled and then failed to provide proper notice, she denied him Father's Day visitation.  The next weekend, Father was late to the custodial exchange and Mother denied him a visit.  Finally, Father's hotel records demonstrate[d] that he had overnight visits with the children during the weekends of March 9-11, 2018, April 4-6, 2018, April 20-23, 2018, July 3, 2018, July 14, 2018, August 24-26, 2018, and September 7-9, 2018.  [T]he hotel receipts identif[ied] Father's address as that of the United States [P]ost [O]ffice building rather than Father's post office box.

From September 8, 2018[,] through early May 2019, a period of eight months, Father did not exercise any periods of custody with the children.  Father ha[d] some health issues in September 2018[.  B]eginning in October [2018,], after [receiving] notice of the mortgage foreclosure [pertaining to the marital residence[,] Father chose to cancel his custodial time with the children because he had no money[] and no home.  Mother repeatedly reached out to Father, [] expressed concern for him, and inquired as to his living situation and his health.  Mother offered to help[] and even

---

[4] We take judicial notice that TalkingParents is a web-based and cellular telephone mobile application that provides co-parenting communication services including, *inter alia*, accountable calling with recording features, secure messaging with unalterable records, and a shared calendar to manage custody schedules and appointments.  *See* https://talkingparents.com/home (last visited April 8, 2021).

offered to buy him a phone. Additionally, Mother, on multiple occasions, [pleaded] with Father to step up as a parent. In February 2019, she even offered to buy movie tickets for him [so he could] take the children to a movie. Father declined the offer and chose not to exercise his custodial time. [T]his lapse in contact between Father and his [children] further eroded their relationship.

. . . On May 13, 2019, Father gave notice to Mother that []for the first time since October 2018[,]he intended to exercise his custody [time] on May 29, 2019[.] Mother denied the visit, stating that it was not feasible. On July 13, 2019, Father told Mother that he had been at the [restaurant] exchange location on June 12[, 2019,] in anticipation of her bringing the children and provided a receipt as proof of his whereabouts. Mother responded that Father did not tell her that he was suddenly resuming visitation. The [trial] court [found] that [it was] unreasonable of Father to have expected Mother and [the children] to wait for Father every other Friday at [the restaurant exchange site] when Father was absent for so many months. The means by which Father attempted to resume visitation only demonstrate[d] how out of touch he was with the children's needs. Nevertheless, throughout the rest of the summer of 2019, some visitation resumed and there was civil contact and communication between Mother and Father, [which] demonstrate[d] some flexibility with respect to Father's visits. On three occasions, only [S.S.] visited with Father.

Meanwhile, the [trial] court proceedings continued, and on August 27, 2019, after a custody conference, [a] custody trial was scheduled to begin on September 6, 2019. On September 4, 2019, the parties mutually requested a continuance, which was granted, and the [custody] trial was rescheduled to October 15, 2019. On September 11, 2019, upon consideration of a [trial] court scheduling conflict, the October 15, 2019 [custody] trial was rescheduled to October 16, 2019. On October 2, 2019, Father submitted an unopposed application for [a] continuance. His request was granted[,] and the [custody] trial was rescheduled to December 6, 2019.

Significantly, from September 18, 2019[,] through Thanksgiving 2019, Father repeatedly told Mother that he was unable to exercise his custodial time because he did not have money or a home. Within ten days of the [start of the] custody trial, Father demanded to exercise [his custodial time] the weekend after Thanksgiving. Although the record [was] devoid of events

necessitating police involvement, Father demanded that the custody exchange take place at the police station. He also told Mother [not] to [] call him and that future non-emergency calls from her would be reported to the police. Thereafter, in late December 2019, Father refused to tell Mother prior to the custody exchange where he intended on stay[ing] with the children. He insisted that because the [custody] order did not require [disclosure of this information], he was not going to [provide the information.] The [trial] court [found] this to be unreasonably uncooperative. Mother reminded him that on a prior occasion[,] he considered sleeping in the car with the children. At [that] time[,] there was some discussion regarding Father's sub[-]lease of an apartment in Allentown, [Pennsylvania,] but he told Mother that he did not have a bed for the children[] and implied that he would come and get the beds from the marital residence as per [his] bankruptcy case. Ultimately, the parents acknowledged that the children only wanted a day[-]visit with Father[,] and on December 30, 2019, Father exercised a day[-]visit.

This late December [2019] exchange [was] further evidence of Father's housing instability. For many months [prior], Father [failed to provide] a verified local residence, and his periods of [overnight] partial physical custody [of] the children [had] been at various hotels. At the time of the July 2019 custody conference held on the pending petitions, Father resided in Niagara Falls, New York. However, since December 2019, Father's address has remained a mystery. On December 6, 2019, he offered [a post office box] as his address, but on December 26, 2019, he asserted that his address was [an apartment in Allentown, Pennsylvania.] Sometime thereafter, Father moved to a hotel. In March [] 2020, he moved to [] New Jersey[.] Father testified that when he [was] in[-]between residences, he stay[ed] at hotels. Mother [] previously expressed concern about the children's safety and supervision at hotels. The children [] told her that they were left unattended in the hotel rooms and general areas [of the hotels] and that conditions [at the hotels] were not clean.

[On] day three of the custody trial[ (July 16, 2020)], Father testified [*via* video communication] from an outdoor porch. When the [trial] court asked Father for his address, he stammered, hesitated, paused, and then, looked over at the street signs. Father could not, without assistance, state his address. After [the custody hearing concluded], Father submitted [] exhibits, which purportedly confirm[ed] his address[. The exhibits] consist[ed] of a picture of [an apartment complex] sign, a curbside picture of

the [apartment complex] management office, a picture of a couch, and a picture presumably of an apartment door from the inside of an apartment. [If,] in fact[,] Father reside[d] in New Jersey, the proximity of the residences of the parties [was] 90 minutes apart.

Beyond this, Mother has been the primary caretaker [of the children] for the past six years. She [] performed nearly all [] the parental duties on behalf of the children. Father, by his own conduct, [] had minimal involvement. Mother [] maintained a loving, stable, consistent[,] and nurturing relationship with the children[, which was] adequate for their respective emotional needs. She [] attended to the daily physical, emotional, developmental, educational, and special needs of each child. Moreover, both children excel[led] in [school, which] they have attended since elementary school. They each have taken musical instruction for years. The need for stability and continuity in the children's education, family life, and community life weigh[ed] in favor of Mother. The [children] are two years apart in age and have a close sibling relationship. Neither parent has any other children. Mother is available to care for the children and make[s] appropriate child-care arrangements.

Neither Mother nor Father have family who reside in the United States. There have been periods of time when maternal aunt and maternal grandmother have visited Mother and the children for extended periods of time. Father filed an eviction action against maternal grandmother, [when] she [stayed] in the marital residence [during a previous visit]. The children communicate regularly with Mother's family in [the Republic of] India *via* advanced communication technology. There was no evidence submitted that the children have contact with Father's family.

In recent months, conversation between Mother and Father has degenerated. There [was] occasional name[-]calling and short-tempered remarks. Immediately after the February 7, 2020 incident (discussed below), Father placed a hold on Mother's mail. Mother was forced to file a petition with the [trial] court to release her mail and the children's mail. In April 2020, the [trial] court entered an order [in] an attempt to resolve the dispute[. H]owever, [] in June [2020,] Mother requested that Father release her mail.

There are competing petitions related to Father's contact with the children. Mother asserts that Father has not exercised his [custodial time] and[,] subsequently, Father asserts that Mother

- 7 -

has interfered and has not brought the children to the custody exchange [location] per the [trial] court order. The record demonstrates that Mother consistently made the children available throughout 2018, 2019[,] and into 2020. It was only after Father chose not to exercise his custodial time for a substantial period of time without justification, that Mother began to allow the children to refuse visits [with Father].

The [trial] court interviewed the children. They are intelligent and talented[.] Each [child] verbally expressed concern for their Father and fear of his temper. Father's aggressive behavior is evidenced by the children's testimony, Mother's testimony, and prior [trial] court proceedings. In 2014[,] and 2015, multiple protection from abuse actions [were] filed between the parties. However, the children [were] not at risk of harm.

The real concern for the [trial] court in this case [was] the alienation of the children from their Father. Phone calls previously were directly between Father and the [children]. However, at some point in 2019, [the children] stopped responding to his calls and began to resist visits with him. While Mother [encouraged the children] to call [Father], she [left] the decision up to them. It is clear that, as a result of Father's inconsistent contact, his relationship with his [children was] strained.

[Based upon the trial court's] interview of the [children], while it is clear they love their Father, they do not feel comfortable with him, especially overnight. Overnight[] visits with Father have been at hotels. If Father [] had an apartment over the past two or three years, the children have not been there. The children remember visits with their Father where he was largely preoccupied with his work on a computer. The children have not had regular, consistent contact with Father for a substantial period of time. More recently, in February 2020, there was an event at the custody exchange that resulted in tears, video, and the children's refusal to go with Father.

The [trial] court has been assigned to this family for years. Father's vindictiveness has not abated despite the lapse of time, his health issues, his financial circumstances, or the COVID-19 pandemic. He [] demonstrated to the [trial] court that he [was] unable[] to co-parent with Mother. Father has not been available in any substantial way to participate in and share legal custody, [and] he has conducted himself contrary to the best interests of the children.

- 8 -

The children are alienated from their Father, not as a result of Mother's action, but rather[,] as a result of Father's conscious choice not to exercise substantial periods of [custodial time]. He has not actively participated in the children's lives. Despite this, the [children] have excelled at school and in their extracurricular activities. While it is clear that they love their Father, the children are no longer comfortable in his care, especially for an overnight visit at a hotel. The [trial] court can only hope that consistent day[-]visits on alternating weekends will provide Father with the opportunity to heal and rebuild the relationship that he once had with his [children]. Time is of the essence for Father to let go of his contempt for Mother and focus on the remaining years of his [children's] adolescence.

Trial Court Opinion, 9/16/20, at 8-17 (record citations, footnotes, and extraneous capitalization omitted).

On September 16, 2020, the trial court entered the Final Custody Order, which, *inter alia*, denied Father's February 18, 2020 petition requesting that Mother be found in contempt of a custody order regarding visitation, and granted Mother sole legal custody and primary physical custody of the children. Trial Court Order, 9/16/20, at §§ 1, 4, and 5.[5] The Final Custody Order directed Mother to "take any and all necessary steps to obtain, maintain, and possess the [c]hildren's passports and travel documents" but prohibited Mother from traveling internationally with the children without first obtaining Father's consent or the trial court's approval. *Id.* at § 4.

That same day, the trial court entered the First Passport Order directing the Lehigh County Family Court Office to release S.H.S.'s "expired Republic of

---

[5] The Final Custody Order stated that it superseded all prior custody orders and was effective immediately.

India [p]assport and [r]enewed Republic of India [p]assport" to Mother. Trial Court Order, 9/16/20. On September 24, 2020, the trial court entered the Second Passport Order directing the Lehigh County Clerk of Judicial Records to release S.H.S.'s Republic of India passport, which expired in 2011, and S.S.'s United States of America passports, which expired in 2013 and 2018, to Mother. Trial Court Order, 9/16/20. These three appeals followed.[6]

Father raises the following issues, relative to the instant appeals, for our review:[7]

> [1.] Did the trial court commit an abuse of discretion and error[] of law [when] the [trial] court failed to conduct an evidentiary hearing on [Father's] contempt petition filed February 18, 2020, and further violated [Father's] procedural due process rights by not providing notice?

---

[6] Both Father and the trial court complied with Pa.R.A.P. 1925. The record demonstrates that, in compliance with **Commonwealth v. Walker**, 185 A.3d 969 (Pa. 2018), and its progeny, Father filed a separate notice of appeal and a separate Rule 1925(b) statement for each appeal. The trial court subsequently filed a separate Rule 1925(a) opinion for each appeal.

[7] Father's brief sets forth twelve issues in total. Only those issues which relate to the instant appeals, that is to say 1858 EDA 2020, 1859 EDA 2020, and 1886 EDA 2020, are currently before this Court and reproduced herein. Father raises six additional issues, **see** Father's Brief § IV, ¶¶1-6, regarding his appeal docketed in this Court at 1887 EDA 2020. Similarly, Father raises one issue, **see id.** at ¶8, regarding his appeal docketed in this Court at 1888 EDA 2020, and two issues, **see id.** at ¶¶9-10, regarding this appeal docketed in this Court at 1889 EDA 2020. On November 17, 2020, in separate *per curiam* orders, this Court dismissed *sua sponte* Father's appeals at 1887 EDA 2020, 1888 EDA 2020, and 1889 EDA 2020, as each being a duplicate appeal of the appeal docketed at 1886 EDA 2020. Therefore, we will not consider the issues pertaining to the three aforementioned dismissed appeals.

[2.]   Did the trial court commit an abuse of discretion and error[]
       of law[ that violated Father's] procedural due process rights
       by not providing an opportunity [for Father] to be heard and
       notice [regarding Mother's possession of the children's
       passports?[8]]

Father's Brief at 4-5.[9]

In his first issue, Father challenges the trial court's order denying his

petition to find Mother in contempt of the March 15, 2018 custody order on

the grounds that the trial court failed to conduct an evidentiary hearing and

violated his due process rights by not providing notice of a contempt hearing.

Father's Brief at 66.

In reviewing orders denying, or granting, petitions of contempt, this

Court is

> limited to determining whether the trial court committed a clear
> abuse of discretion.  Moreover, much reliance is given to the
> discretion of the trial [court].  Accordingly, we are confined to a
> determination of whether the facts support the trial court's
> decision.  Also[,] in civil contempt proceedings[,] the complaining
> party has the burden of proving by a preponderance of the
> evidence that a party violated a court order.

***Chrysczanavicz v. Chrysczanavicz***, 796 A.2d 366, 368-369 (Pa. Super.

2002) (citations, quotation marks, and original brackets omitted).  "[T]he five

---

[8] Father raises the same issue, which is identified herein as his second issue,
in both his appeals docketed in this Court at 1858 EDA 2020 and 1859 EDA
2020.

[9] Father's brief was filed by his now-counsel of record, Joshua L. Thomas,
Esquire.  Mother, who represents herself, *pro se*, does not appear to have filed
a brief in response to Father's three appeals.

elements deemed essential to a civil contempt adjudication are: (1) a rule to show cause why attachment should issue; (2) an answer and hearing; (3) a rule absolute; (4) a hearing on the contempt citation; and (5) an adjudication." **Id.** at 369 (citation and original quotation marks omitted). These five elements protect both the party against whom the allegations of contempt are lodged, as well as the complaining party, so that both parties have an opportunity to be heard. **Id.** "Fulfillment of all five factors is not mandated, however. The essential due process requisites for a finding of civil contempt are notice and an opportunity to be heard." **Harcar v. Harcar**, 982 A.2d 1230, 1235 (Pa. Super. 2009) (citations, original quotation marks, and original brackets omitted).

Here, Father contends that the trial court failed to provide him notice of an evidentiary hearing on his petition for contempt and refused to conduct a hearing on the matter at which time Father could present his argument. Appellant's Brief at 66. In denying Father's petition for contempt, the trial court stated,

> On February 18, 2020, Father filed a petition for contempt of a custody order and alleged that Mother willfully disobeyed the March 15, 2018 order by failing to bring the children for visits with him on June 15, 2018[,] June 30, 2018[,] June 28, 2019[,] July 12, 2019[,] November 29, 2019[,] and January 10, 2020[,] and by failing to unlock her car doors on February 7, 2020. Father also alleged that Mother would bring only one child to the visit, failed to return calls for the children, failed to notify him of dental and medical appointments, school conferences[,] and child[-]care issues, failed to provide him with [a] copy of the child's green card, and refus[ed] to discuss custodial issues with the children.

- 12 -

Regarding June 15, 2018, Mother did not provide the children to Father because he notified her that he would be picking them up on June 16, 2018. Regarding the June 30, 2018 custodial visit[,] Father timely advised Mother[, on June 27, 2018,] that he was only exercising custody on Saturday night June 30, 2018. The pick-up time was 10:00 [a.m.] Mother appeared and waited until 10:04 [a.m.] and Father had not shown up. Father texted Mother to say that he was running late[] and would be there at 1:00 [p.m.] While the [custody] order provides [that] the parties should be flexible, Mother was not required to make the children available three hours after the exchange time. On June 28, 2019, Father appeared for the custody exchange at [the restaurant exchange site] and texted Mother at 6:16 [p.m.] However, there [was] no communication regarding the exchange in TalkingParents. Similarly, on July 12, 2019[,] Father appeared at [the restaurant exchange site] without providing advanced notice to Mother.

Father showed up unexpectedly [for custodial exchanges] after having consistently missed his custodial time for the preceding eight to nine months. It [was] unreasonable for Father to expect Mother to bring the children to [the restaurant exchange site] as per [the custody] order every alternating Friday, when Father's pattern of behavior demonstrate[d] that he [chose] not to exercise his custodial time. It [would be] detrimental to the best interests of the children to wait at a custody exchange [site] twice a month only to have their Father never show up. While the [custody] order require[d] Mother to bring the children to the [custody] exchange [site], and [did] not require[] Father to provide prior notice to Mother, eight or nine months [] passed where Father failed to exercise his custodial time. Mother's non-appearance [was] not contemptuous given Father's conduct and pattern of behavior.

On November 29, 2019, there was an argument at the [custody] exchange [site,] which ultimately resulted in Mother leaving with the children. On January 9, 2020, the day before the scheduled January 10, 2020 custodial exchange, Father advised Mother that he wanted to exercise his custodial time. However, Mother responded that the children [were] not willing to go and that they ha[d] homework. Mother indicated that the children [were] growing more resistant to visiting their Father. Father did not respond to Mother's statements regarding the children's resistance[] but[,] rather[,] appeared at [the restaurant exchange site]. Mother and the children did not appear. Just a few days

- 13 -

later, Mother and the children suggested that they resume contact between Father and [the children] with a dinner visit, but Father rejected the offer and scolded Mother for having a "habit of not following the custody order." Finally, on February 7, 2020, Mother and Father both appeared for the custodial exchange [site]. The children were resistant and did not want to get out of their Mother's car. Father physically grabbed [S.S.] The [trial] court viewed a recording of part of the incident. There was crying and yelling. A passerby appeared to be concerned about what was happening. Ultimately, Mother locked her car [doors] and would not release the children to Father. Father appeared frustrated, angry, and aggressive.

Trial Court Opinion, 9/16/20, at 20-21 (record citations and extraneous capitalization omitted).

A review of the record demonstrates that the trial court conducted a hearing on, *inter alia*, Mother's petition for modification of the custody order on December 6, 2019, December 26, 2019,[10] and July 16, 2020.[11] After the

_____

[10] The trial court orders scheduling the December 6, 2019 and December 26, 2019 custody hearings stated that the purpose of the hearings was for consideration of Father's petition for contempt filed on April 4, 2018, and his October 30, 2019 emergency motion to grant relief to enter an order for the Master in the divorce proceeding to file an equitable distribution report and recommendations. Trial Court Order, 11/20/19; **see also** Trial Court Order, 12/11/19. The hearings were also being held to address Mother's petition for modification of the custody order, a May 2, 2019 petition for contempt, and an October 28, 2019 petition for contempt regarding Father's failure to follow the June 27, 2017 court order, which pertained to the renewal and reissuance of the children's passports. Trial Court Order, 11/20/19; **see also** Trial Court Order, 12/11/19.

[11] The trial court order scheduling the July 16, 2019 custody hearing stated that the purpose of the hearing, in addition to the items considered at the December 6, 2019 and December 26, 2019 custody hearings, was to consider Father's February 18, 2020 petition for contempt of a custody order. Trial Court Order, 6/3/20.

trial court conducted the December 6, 2019 and December 26, 2019 custody hearings, Father filed a petition for contempt alleging that Mother violated the March 15, 2018 custody order. Father received notice that his petition for contempt was to be considered by the trial court at the next custody hearing. **See** Trial Court Order, 2/20/20; **see also** Trial Court Order, 3/16/20; Trial Court Order, 4/7/20; Trial Court Order, 4/24/20; Trial Court Order, 6/3/20.[12] A review of the July 16, 2020 custody hearing transcript demonstrates that Father had ample opportunity to present his argument and evidence in support of his February 18, 2020 contempt petition. **See, e.g.,** N.T., 7/16/20, at 23-68. The trial court provided Father with notice that the trial court would address his petition for contempt at the July 16, 2020 custody hearing, and Father had the opportunity to be heard and to present evidence in support thereof. Therefore, the essential due process requirements for Father's contempt petition have been satisfied, as those requirements apply to Father. Consequently, Father's first issue is without merit.

Father's second issue challenges the trial court's Final Custody Order, as it pertains to the release of the children's expired and unexpired passports to Mother, on the grounds that the Final Custody Order violates Father's due process rights. Father's Brief at 75-79. Specifically, Father argues that

---

[12] The third session of the custody hearing was rescheduled multiple times due to the COVID-19 pandemic and the closure of, *inter alia*, the Lehigh County judicial system.

Mother did not request possession of the passports in a motion or petition and the trial court directed that the passports be released to Mother without providing Father notice of this issue.  *Id.*

Father's issue of whether a procedural due process violation occurred presents a question of law for which our standard of review is *de novo* and our scope of review if plenary.  *S.T. v. R.W.*, 192 A.3d 1155, 1160 (Pa. Super. 2018).

> In custody hearings, parents have at stake fundamental rights: namely, the right to make decisions concerning the care, custody, and control of their child. *See Troxel v. Granville*, 530 U.S. 57, [] (2000); *see also* [U.S. Const. amend. V and XIV]; [*see, generally*,] *D.P. v. G.J.P.*, [] 146 A.3d 204 ([Pa.] 2016).
>
> Due process must be afforded to parents to safeguard these constitutional rights.  "Formal notice and an opportunity to be heard are fundamental components of due process when a person may be deprived in a legal proceeding of a liberty interest, such as physical freedom, or a parent's custody of [his or] her child." *J.M. v. K.W.*, 164 A.3d 1260, 1268 (Pa. Super. 2017) (*en banc*)[, ]*quoting Everett v. Parker*, 889 A.2d 578, 580 (Pa. Super. 2005)[.]  It is well[-]settled that[,] "procedural due process requires, at its core, adequate notice, opportunity to be heard, and the chance to defend oneself before a fair and impartial tribunal having jurisdiction over the case."  [*J.M.*, 164 A.3d at 1268] n.5[, ]*citing Everett*[,] 889 A.2d [at] 580[;] *see also Garr v. Peters*, 773 A.2d 183, 191 (Pa. Super. 2001).  "Due process is flexible and calls for such procedural protections as the situation demands." *See, e.g.*, *In re Adoption of Dale A., II*, [] 683 A.2d 297, 300 ([Pa. Super.] 1996)[.]

*S.T.*, 192 A.3d at 1161 (emphasis omitted).

As discussed *supra*, one purpose of the custody hearings held on December 6, 2019, December 26, 2019, and July 16, 2020, was to address Mother's October 28, 2019 petition for contempt.  In this contempt petition,

Mother asserted that Father failed to comply with the June 27, 2017 court order, which required Mother and Father "to take all reasonable measure[s] to insure that their children's passports remain[ed] current and renewed within a reasonable time of expiration." **See** Trial Court Order, 6/27/17; **see also** Mother's Petition for Contempt, 10/28/19. The record reveals that Father received multiple notices regarding the scheduling of and purpose of the custody hearings, as noted **supra**. Father, therefore, received notice as required to protect his due process rights. Moreover, Father was notified prior to the start of the first custody hearing on December 6, 2019, that one of the outstanding issues to be resolved at the conclusion of the custody hearing was the concern regarding renewal of the children's passports. N.T., 12/6/19, at 4. By attending and participating in the custody hearings, Father waived his procedural due process claim that adequate notice was not provided. At the hearing, Father had ample opportunity to present argument, introduce evidence, and cross-examine Mother regarding the passports and who should retain possession of the documents. Having found that Father had notice of the trial court's intent to consider issues surrounding possession of the children's passports and that Father had an opportunity to be heard, we find Father's second issue to be without merit.

Moreover, the Child Custody Act defines "legal custody" as "[t]he right to make **major decisions** on behalf of the child, including, but not limited to, medical, religious[,] and educational decisions." 23 Pa.C.S.A. § 5322 (emphasis added). "When one parent has sole legal custody, that parent has

final authority to make decisions, regardless of whether the other parent agrees or disagrees." **M.P. v. M.P.**, 54 A.3d 950, 953-954 (Pa. Super. 2012). Here, Father does not contest the trial court's order awarding Mother sole legal custody of the children. Trial Court Order, 9/16/20, at ¶2. It is axiomatic that, subject to specific orders issued by the trial court, international travel and the maintenance of related government travel documents constitute major decisions which fall within the purview of the parent who retains legal custody of the child. Therefore, we discern no error in the trial court's decision that Mother, as the parent with sole legal custody of the children, should receive possession of the children's passports, of which all but one was expired. The trial court, furthermore, protected Father's right to control the children's international travel, by requiring Mother to first obtain either Father's permission, or a court order, before permitting the children to travel internationally.

Orders affirmed.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary

Date: 4/19/21